## IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **GREGORY J. SMITH,** | ) |
| | ) |
| | ) **CIVIL ACTION NO. 3:17-191** |
| **Plaintiff,** | ) |
| | ) **JUDGE KIM R. GIBSON** |
| **v.** | ) |
| | ) |
| **NAVIENT SOLUTIONS, LLC,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

Before the Court is Defendant Navient Solutions, LLC's Motion for Summary Judgment (ECF No. 56) and Motion *in Limine* to Preclude Plaintiff's Expert Report and Testimony (ECF No. 60). These motions are fully briefed (*see* ECF Nos. 57-59, 61-62, 65-66) and are ripe for disposition. For the reasons that follow, the Court will **GRANT** Navient's Motion for Summary Judgment (ECF No. 56) and **DENY** its Motion *in Limine* as moot (ECF No. 60).

## I. Background

### A. Procedural Background

On October 17, 2017, Plaintiff Gregory J. Smith filed a two-count Complaint against Navient alleging that Navient: (1) violated the Telephone Consumer Protection Act (TCPA) by placing calls to Smith using an automated telephone dialing system (ECF No. 1 ¶¶ 31-33); and (2) violated Pennsylvania law by invading Smith's privacy and intruding upon his seclusion. (*Id.* ¶¶ 34-36.)

From February of 2018 until February of 2019, the parties engaged in discovery. (*See* ECF Nos. 21, 28, 34.) On March 28, 2019, Navient filed the instant Motion for Summary Judgment. (ECF No. 56.) On April 18, 2019, it filed its Motion *in Limine* (ECF No. 60) to exclude the testimony and report of Smith's expert, Randall Snyder. Those Motions became ripe in May of 2019. (*See* ECF Nos. 65, 66.)

## B.    Factual Background

The Court derives the following facts from Navient's Concise Statement of Material Facts. (ECF No. 58.) Smith never filed a responsive concise statement of material facts as required by Local Rule 56. *See* LCvR 56(C).[1]  To oppose a motion for summary judgment, the Local Rules provide that the opposing party:

> shall file . . . [a] separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by: (a) admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material; (b) setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record . . . ; and (c) setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the Court to determine the motion for summary judgment.

LCvR 56(C)(1).

"Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purpose of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of

---

[1] Available at https://www.pawd.uscourts.gov/sites/pawd/files/lrmanual20181101.pdf.

-2-

the opposing party." LCvR 56(E); *see also Wylie v TransUnion, LLC,* No. 3:16-cv-102, 201 WL 4357981, at *4-*8 (W.D. Pa. Sept. 29, 2017) (deeming the facts in movant's concise statement of material facts to be admitted because non-movant did not file a responsive concise statement in accordance with LCvR 56); Practices and Procedures of Judge Kim R. Gibson, at 27-29[2] ("All material facts set forth in the Movant's Concise Statement of Undisputed Material Facts shall be deemed admitted for the purposes of summary judgment unless specifically controverted as set forth herein."). Accordingly, the Court will treat the following facts from Navient's Concise Statement of Material Facts as admitted.

### 1.    Navient Services Smith's Loan

Smith co-signed on $20,000 in private loans that his daughter took out to go to college. (ECF No. 58 ¶¶ 1-2.) Navient, which is in the business of servicing private student loans and collecting payments, began servicing Smith's loans when they were taken out in August of 2005 and March of 2006. (*Id.* ¶¶ 3-4.)

Smith defaulted on his loan obligations. (*Id.* ¶ 5.) On February 23, 2015, Smith provided Navient with a cell phone number to call regarding the loans. (*Id.* ¶ 6.) Through an automated call menu, Smith indicated that he called Navient from a cell phone, entered his cell phone number, and then authorized "Navient . . . to contact [his] number, even if it is a cell phone, using a dialer, text or prerecorded message, concerning any of your current or future accounts." (*Id.* ¶ 7.)

---

[2] Available at https://www.pawd.uscourts.gov/sites/pawd/files/JG-Practices-Procedures.pdf.

On May 2, 2015, Smith entered his mobile number on Navient's website and consented to Navient contacting his mobile number "using any means of communication, including, but not limited to, calls placed to [his] cellular phone using an automated dialing device, calls using prerecorded messages and/or SMS text messages." (*Id.* ¶¶ 8-9.)

On January 20, 2017, Smith requested that Navient stop calling his cell phone. (*Id.* ¶ 11.) Navient made 136 calls to Smith's cell phone after he revoked his consent to be called. (*Id.* ¶ 13.) Smith only answered one of the 136 calls that Navient placed to Smith's cell phone after January 20, 2017. (*Id.* ¶¶ 14-15.) Navient alleges that Smith often did not have his cell phone with him when Navient called him. (*Id.* ¶¶ 16-17.)

## 2.  Navient's ININ Call System

All the calls that Navient made to Smith after January 20, 2017 were placed using call software called "ININ." (*Id.* ¶ 19.) "The ININ telephony platform is a highly sophisticated design engine that [Navient] has custom configured to support its call centers in placing outbound calls and receiving inbound calls." (*Id.* ¶ 20.)

The ININ system utilizes three different modes—"preview," "predictive," and "agentless"—when it places calls to consumers. (*Id.* ¶¶ 21-23.) In "preview" mode, a Navient agent must take some "human action" to place calls to consumers. (*Id.* ¶ 33.) In preview mode, Navient representatives review customer information from a database and choose which customers to call. (*Id.* ¶¶ 34-36.) In "predictive" and "agentless" modes, by contrast, the ININ system can initiate a call to a consumer without a Navient agent taking action to place the call. (*Id.* ¶ 31.) Of the 136 total calls that Navient placed to Smith's cell phone, twelve were placed in

-4-

preview mode and the remaining calls were placed in predictive or agentless modes. (*Id.* ¶ 30.) In all three of these modes, a human representative (as opposed to a prerecorded voice) speaks with the consumer—the difference between the modes is the manner in which the number is dialed. (*Id.* ¶¶ 30-36.)

The ININ system does not have the capacity to randomly generate telephone numbers to be called. (*Id.* ¶ 27.) Similarly, the ININ system does not have the capacity to generate sequential lists of telephone numbers. (*Id.* ¶ 28.) Rather, the telephone numbers that the ININ system dials are uploaded from a database containing Navient's customer information. (*Id.* ¶¶ 25-27.) As support for its assertions on the functionality of the ININ system, Navient cites the declaration and deposition testimony of Joshua Dries, its Senior Director of Dialer Operations (*id.* ¶¶ 18-28, 31-37) and the testimony by Smith's expert, Randall Snyder. (*Id.* ¶¶ 27-29.) Navient included Randall Snyder's declaration in the instant case in the Appendix to its Motion for Summary Judgment. (ECF No. 59-8.)

## II.     Jurisdiction and Venue

The Court has jurisdiction over Plaintiff's TCPA claim under 28 U.S.C. § 1331. The Court has supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to this case took place in the Western District of Pennsylvania.

## III.     Legal Standard

"Summary judgment is appropriate only where . . . there is no genuine issue as to any material fact . . . and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v.*

*Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010) (quoting *Ruehl v. Viacom, Inc.,* 500 F.3d 375, 380 n.6 (3d Cir. 2007)); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(a). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson,* 477 U.S. at 248. The court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.,* 260 F.3d 228, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 n.11, (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v.*

*Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir. 1993); *see also Podobnik v. U.S. Postal Serv.*, 409

F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present

more than just bare assertions, conclusory allegations or suspicions to show the existence of a

genuine issue") (internal quotation marks omitted).

**IV.    Discussion**

      **A.    Navient is Entitled to Summary Judgment on Smith's TCPA Claim**

            **1.    Background on the TCPA and the Definition of ADTS**

Smith alleges that Navient violated 47 U.S.C. § 227(b)(1)(A)(iii).   (ECF No. 1 ¶ 32.)

§ 227(b) provides that:

> It shall be unlawful for any person within the United States, or any person
> outside the United States if the recipient is within the United States—
>
> (A) to make any call (other than a call made for emergency purposes or made
> with the prior express consent of the called party) using any automatic telephone
> dialing system or an artificial or prerecorded voice—
>
> (iii) to any telephone number assigned to a paging service, cellular telephone
> service, specialized mobile radio service, or other radio common carrier service,
> or any service for which the called party is charged for the call, unless such call is
> made solely to collect a debt owed to or guaranteed by the United States[.]

47 U.S.C. § 227(b).

Smith alleges that Navient "violated 47 U.S.C. § 227(b)(1)(A)(iii) by calling Mr. Smith's

cellular phone number, using an automatic telephone dialing system." (*Id.*) Therefore, Smith's

claim hinges on whether Navient utilized an ATDS when it called Smith. The TCPA defines

"automatic telephone dialing system" (referred to as both an "ATDS" or "autodialer") as

"equipment which has the capacity—(A) to store and produce telephone numbers to be called,

-7-

using a random or sequential number generator; and (B) to dial such numbers." 47 U.S.C. §

227(a)(1).

Both the FCC and federal courts have elaborated on the definition of ATDS. The FCC

released guidance on what constitutes an ATDS (or autodialer) in 2003, 2008, and 2015. *See In re*

*the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 18

F.C.C.R. 14014, 2003 WL 21517853 (F.C.C. 2003) (hereinafter "*F.C.C. Guidance 2003*"); *In re the*

*Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23

F.C.C.R. 559, 2008 WL 65485 (F.C.C. 2008) (hereinafter "*F.C.C. Guidance 2008*"); *In re the Matter of*

*Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 30 F.C.C.R. 7961,

2015 WL 4387780 (F.C.C. 2015) (hereinafter "*F.C.C. Guidance 2015*").

In 2003, the F.C.C. released the following on the definition of an ATDS:

> The statutory definition contemplates autodialing equipment that either stores or
> produces numbers. It also provides that, in order to be considered an "automatic
> telephone dialing system," the equipment need only have the "*capacity* to store or
> produce telephone numbers (emphasis added)...." It is clear from the statutory
> language and the legislative history that Congress anticipated that the FCC,
> under its TCPA rulemaking authority, might need to consider changes in
> technologies. In the past, telemarketers may have used dialing equipment to
> create and dial 10-digit telephone numbers arbitrarily. As one commenter points
> out, the evolution of the teleservices industry has progressed to the point where
> using lists of numbers is far more cost effective. The basic function of such
> equipment, however, has not changed—the *capacity* to dial numbers without
> human intervention. We fully expect automated dialing technology to continue
> to develop.
> . . .
> [T]o exclude from these restrictions equipment that use predictive dialing
> software from the definition of "automated telephone dialing equipment" simply
> because it relies on a given set of numbers would lead to an unintended result.
> Calls to emergency numbers, health care facilities, and wireless numbers would
> be permissible when the dialing equipment is paired with predictive dialing
> software and a database of numbers, but prohibited when the equipment

operates independently of such lists and software packages. We believe the purpose of the requirement that equipment have the "capacity to store or produce telephone numbers to be called" is to ensure that the prohibition on autodialed calls not be circumvented. Therefore, the Commission finds that a predictive dialer falls within the meaning and statutory definition of "automatic telephone dialing equipment" and the intent of Congress.

*F.C.C. Guidance 2003* ¶¶ 132-33. "Predictive dialers are 'dialing systems that store pre-programmed numbers or receive numbers from a computer database and then dial those numbers in a manner that maximizes efficiencies for call centers." *Dominguez v. Yahoo!, Inc.*, No. 13-1887, 2017 WL 390267, at *4 (E.D. Pa. Jan. 27, 2017).

The F.C.C.'s 2008 report on the TCPA reinforced its 2003 guidance on whether predictive dialers qualify as autodialers or ATDSs:

> In this Declaratory Ruling, we affirm that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers. . . . [T]he Commission first sought comment on predictive dialers in 2002 and asked whether using a predictive dialer is subject to the TCPA's autodialer restrictions. The Commission found that, based on the statutory definition of "automatic telephone dialing system," the TCPA's legislative history, and current industry practice and technology, a predictive dialer falls within the meaning and definition of autodialer and the intent of Congress.

*F.C.C. Guidance 2008* ¶¶ 12-13.

Finally, in 2015, the F.C.C. released more guidance on what software constitutes an ATDS or autodialer. It stated that:

> We reaffirm our previous statements that dialing equipment generally has the capacity to store or produce, and dial random or sequential numbers (and thus meets the TCPA's definition of "autodialer") even if it is not presently used for that purpose, including when the caller is calling a set list of consumers. We also reiterate that predictive dialers, as previously described by the Commission, satisfy the TCPA's definition of "autodialer" for the same reason.
> 
> …

In the 2003 TCPA Order, the Commission described a predictive dialer as "equipment that dials numbers and, when certain computer software is attached, also assists telemarketers in predicting when a sales agent will be available to take calls. The hardware, when paired with certain software, has the capacity to store or produce numbers and dial those numbers at random, in sequential order, or from a database of numbers." In the 2008 *ACA Declaratory Ruling*, the Commission "affirm[ed] that a predictive dialer constitutes an automatic telephone dialing system and is subject to the TCPA's restrictions on the use of autodialers." The Commission considered ACA's argument that a predictive dialer is an autodialer "only when it randomly or sequentially generates telephone numbers, not when it dials numbers from customer telephone lists," and stated that ACA raised "no new information about predictive dialers that warrant[ed] reconsideration of these findings" regarding the prohibited uses of autodialers—and therefore predictive dialers—under the TCPA.

. . .

[T]he Commission has also long held that the basic functions of an autodialer are to "dial numbers without human intervention" and to "dial thousands of numbers in a short period of time." How the human intervention element applies to a particular piece of equipment is specific to each individual piece of equipment, based on how the equipment functions and depends on human intervention, and is therefore a case-by-case determination.

*F.C.C. Guidance 2018* ¶¶ 10, 13, 17. The upshot of the F.C.C.'s 2018 guidance was to reinforce that an ATDS or autodialer is a system that has the "capacity" or "potential ability" to randomly or sequentially generate numbers and then dial them. *Id.* ¶¶ 14, 18-20. However, from these three sets of guidance, it is difficult to discern whether a predictive dialer or a device that utilizes predictive-dialing software—where computer software automatically calls numbers from a preprogrammed list of numbers—qualifies as an ADTS.

Later in 2018, the United States Circuit Court for the District of Columbia considered consolidated challenges to the F.C.C.'s guidance on the TCPA—and specifically guidance on the definition of ADTS—in *ACA Int'l v. FCC*, 885 F.3d 687 (D.C. Cir. 2018). The D.C. Circuit held

that the F.C.C.'s guidance on the definition of ADTS is arbitrary and capricious, and therefore impermissible, for two reasons.

First, the D.C. Circuit held that the F.C.C.'s guidance on what constitutes an ATDS was unreasoned and impermissible rulemaking because the F.C.C.'s definition of ATDS—a system that has the *potential capacity* to randomly or sequentially generate numbers and then dial them—is so broad that a normal smartphone could qualify as an ATDS. *Id.* at 695-97. The *ACA* Court reasoned that:

> In the end, then, the Commission's order cannot reasonably be understood to support the conclusion that smartphones fall outside the TCPA's autodialer definition: any such reading would compel concluding that the agency's ruling fails arbitrary-and-capricious review. The more straightforward understanding of the Commission's ruling is that all smartphones qualify as autodialers because they have the inherent "capacity" to gain ATDS functionality by downloading an app. That interpretation of the statute, for all the reasons explained, is an unreasonably, and impermissibly, expansive one.

*Id.* at 700.

Second, the D.C. Circuit held that the F.C.C.'s guidance fails as reasoned rulemaking because it does not clearly state whether a predictive dialer qualifies as an ATDS. *Id.* at 701-04. The F.C.C.'s guidance stated that "the basic function of an autodialer is the ability to dial numbers without human intervention"—which would render any predictive-dialer software an ATDS. *Id.* at 703 (citing *F.C.C. Guidance 2003* ¶ 132; *F.C.C. Guidance 2008* ¶ 13; *F.C.C. Guidance 2015* ¶ 17). However, in the 2003 Guidance, the F.C.C. stated that some predictive dialers may qualify as ATDSs even if they do not have the ability to general random or sequential phone numbers. *F.C.C. Guidance 2003* ¶¶ 131, 133. The 2015 Guidance reaffirmed that predictive dialers generally qualify as ATDSs. *F.C.C. Guidance 2015* ¶¶ 12-14. However, the F.C.C.'s

guidance is at odds with the statutory definition of ADTSs—"equipment which has the capacity . . . to store and produce telephone numbers to be called, using a random or sequential number generator," 47 U.S.C. § 227(a)(1)—if devices that do not have the capacity to randomly or sequentially generate phone numbers to be called may also be considered ATDSs or autodialers. *ACA Int'l*, 885 F.3d at 702.

Moreover, the 2015 Guidance also stated that a device may qualify as an ATDS or an autodialer even if it does not have the capacity to dial numbers without human intervention. *Id.* (citing *F.C.C. Guidance 2015* ¶ 20). The D.C. Circuit pointed out that this is directly at odds with another section of the 2015 guidance, which states that "the basic function of [an ATDS or autodialer] . . . is the *capacity* to dial numbers without human intervention. *F.C.C. Guidance 2015* ¶ 14. Accordingly, the D.C. Circuit held that "the [F.C.C.'s] ruling, in describing the functions a device must perform to qualify as an autodialer, fails to satisfy the requirement of reasoned decisionmaking" and rejected the F.C.C.'s interpretation of autodialer or ATDS. *ACA Int'l* at 702.

Courts have held that the D.C. Circuit's *ACA International* decision invalidated the F.C.C.'s guidance from 2003, 2008, and 2015.[3] *See, e.g., Marks v. Crunch San Diego, LLC*, 904 F.3d 1041, 1049-50 (9th Cir. 2018); *Richardson v. Verde Energy USA, Inc.*, 354 F. Supp. 3d 639, 648 (E.D. Pa. 2018). These courts have held that "only the statutory definition of ATDS as set forth by

---

[3] Courts have spent considerable time considering whether the D.C. Circuit's *ACA International* decision invalidated only the F.C.C.'s 2015 guidance, or whether it invalidated the F.C.C.'s guidance from 2003, 2008, and 2015. *See, e.g., Espejo v. Santander Consumer USA, Inc.*, No. 11 C 8987, 2019 WL 2450492, at *5, n.2 (N.D. Ill. June 12, 2019) (collecting cases where district courts decided that the *ACA International* invalidated the 2003, 2008, and 2015 F.C.C. guidance). The Court agrees that the *ACA International* decision explicitly invalidated the F.C.C.'s 2015 guidance, and by implication the 2003 and 2008 guidance.

Congress in 1991 remains" and that after *ACA International*, "we must begin anew to consider the definition of ATDS under the TCPA." *Marks*, 904 F.3d at 1049-50.

The Third Circuit followed the D.C. Circuit's *ACA International* decision and rejected the F.C.C.'s guidance on the definition of ATDS. *See Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 119 (3d Cir. 2018). In *Dominguez*, the Third Circuit held that courts must interpret ATDS to mean a system that has "the present capacity to function as an autodialer." *Id.* There, the Third Circuit affirmed the district court's decision to grant summary judgment in defendant's favor because the text-message service at issue did not have the present capacity to store or produce telephone numbers using a random or sequential number generator. *Id.* at 117, 121.

Courts have elaborated upon the Third Circuit's holding in *Dominguez*. The Ninth Circuit characterized the Third Circuit's *Dominguez* decision as holding "that a device must be able to generate random or sequential numbers in order to qualify as an ATDS." *Marks*, 904 F.3d at 1052 n.8; *Richardson*, 354 F. Supp. 3d at 650 ("[T]o qualify as an ATDS, calling equipment must have the capacity to generate numbers using a random or sequential number generator and then call those numbers."); *Collins v. Nat'l Student Loan Program*, No. 17-5345, 2018 WL 6696168 (D. N.J. Dec. 20, 2018).

After *ACA International* and *Dominguez*, district courts have dealt with the question of whether a device utilizing predictive-dialing software is an ATDS. These courts have held that a predictive dialer may constitute an ATDS but that, consistent with *Dominguez*, the predictive dialer must have the capacity to generate numbers randomly or sequentially and then call them. *See, e.g., Richardson*, 34 F. Supp. 3d at 650 (holding that "a device that merely has the capacity to

-13-

store and dial numbers that have been inputted into the equipment does not qualify as an ATDS" because "the ability to generate random or sequential telephone numbers is necessary for a device to qualify as an ATDS"); *Collins*, 2018 WL 6696168, at \*5 (holding that a predictive-dialing device was not an ATDS because plaintiff failed to prove that the device had the present capacity to randomly or sequentially generate numbers); *Fleming v. Associated Credit Servs., Inc.*, 2018 WL 4562460, at \*10 (D. N.J. Sept. 21, 2018) ("Does a system that dials numbers from a list that was not randomly or sequentially generated when the list was created qualify as an ADTS? With only the statutory text to guide me, I am convinced that the answer is no."). Another court characterized the Third Circuit as holding "that the ATDS definition necessarily excludes predictive dialers because they do not have the capacity to generate numbers randomly or sequentially."[4] *Espejo v. Santander Consumer USA, Inc.*, No. 11 C 8987, 2019 WL 2450492, at \*6

---

[4] Some courts that have adopted this position have conducted an in-depth grammatical analysis of the TCPA's definition of ATDS. While the Court finds this analysis unnecessary to reach its conclusion on the definition of ATDS, the reasoning is instructive. The Northern District of Illinois summarized this analysis in *Espejo*:

> This position notes that "store" and "produce" are both transitive verbs that require an object, which in this case is the phrase "telephone numbers to be called." *Pinkus*, 319 F. Supp. 3d at 937. "Despite the disjunctive 'or' linking 'store' and 'produce,' 'store' is not a grammatical orphan, rather, like 'produce,' it is tied to the object, 'telephone numbers to be called.'" *Id.* at 937–38. Moreover, this interpretation emphasizes that the adverbial "using" phrase follows both verbs, so it cannot grammatically modify only "produce." *Id.* at 937. Rather, "[g]iven its placement immediately after 'telephone numbers to be called,' the phrase 'using a random or sequential number generator' is best read to modify 'telephone numbers to be called,' describing the quality of the numbers an ATDS must have the capacity to store or produce." *Id.* at 938. Therefore, "the phrase 'using a random or sequential number generator' necessarily conveys that an ATDS must have the capacity to generate telephone numbers, either randomly or sequentially, and then to dial those numbers." *Id.*

*Espejo*, 2019 WL 2450492, at \*6.

-14-

(N.D. Ill. June 12, 2019) (citing *Pinkus v. Sirius XM Radio, Inc.,* 319 F. Supp. 3d 927, 936-37 (N.D. Ill. 2018)); *see also Richardson,* 354 F. Supp. 3d at 648 (citing *Pinkus,* 319 F. Supp. 3d at 935).

The Court agrees with the reasoning in these cases. Predictive dialers do not necessarily qualify as ATDSs under the plain language of the statute or the Third Circuit's guidance in *Dominguez*. To reiterate, a predictive dialer is a device that automatically calls telephone numbers from a preprogrammed list or separate computer database where telephone numbers are stored. Predictive dialers do not necessarily *generate* numbers to be called. Moreover, predictive dialers do not necessarily have the *capacity* to randomly or sequentially generate numbers to be called. In some cases, predictive dialers may be ATDSs where some feature of the software enables them to randomly or sequentially generate numbers to be called. However, where a predictive dialer merely calls consumer numbers from a list that that is separately created and uploaded onto the software, the predictive dialer itself is not generating any numbers to be called. In that situation, the predictive dialer is not an ATDS so long as it does not have the present capacity to randomly or sequentially generate numbers to be called. In sum, the Court finds that a predictive-dialing device is not an ATDS merely because it calls consumers from a preprogrammed list of numbers that was inputted into the device. Rather, the device itself must have the capacity to generate numbers.

-15-

### 2. Smith's TCPA Claim Fails as a Matter of Law Because Navient Did Not Place Calls to Smith Using an ATDS

In this case, there is no genuine dispute of material fact that Navient complied with the TCPA. The undisputed material facts indicate that the ININ system that Navient used to call Smith was not an ATDS.

The ININ system is not an ATDS because it "does not have the capability to randomly generate numbers to comprise a 10-digit telephone number and then dial that number." (ECF No. 58 ¶ 27.) Further, "[t]he ININ dialing system does not have the capacity to generate a sequential list of numbers for dialing." (*Id.* ¶ 28.) Therefore, based on the Third Circuit's definition of ATDS, the ININ system cannot be an ATDS because it does not *generate*, either randomly or sequentially, numbers to be called. *Dominguez*, 894 F.3d at 117, 121; *see also Richardson*, 34 F. Supp. 3d at 650; *Collins*, 2018 WL 6696168, at \*5.

There is no dispute that the ININ system utilizes predictive-dialing software. (ECF No. 58 ¶¶ 30-33.) However, as previously discussed, a device does not qualify as an ATDS under Third Circuit precedent merely because it utilizes predictive dialing. *Dominguez*, 894 F.3d at 117, 121; *Collins*, 2018 WL 6696168, at \*5; *Fleming*, 2018 WL 4562460, at \*10; *Richardson*, 354 F. Supp. 3d at 650. Rather, the crucial question is whether the ININ system has the present capacity to randomly or sequentially generate numbers to be called, and there is no evidence that the ININ system has that capability.

The declaration of Plaintiff's expert, Randall Snyder, does not create a genuine dispute of material fact on whether the ININ system was an ATDS or autodialer.[5] In his declaration, Snyder outlines the basic functionality of the ININ system. (ECF No. 59-8 ¶¶ 48-60.) He states that the ININ system "maintains outbound automatic dialing servers and a central campaign server to perform outbound automatic dialing functions . . . [such as] automatic dialing and predictive dialing." (*Id.* ¶ 51.) "Through the operational interface, users of the [ININ] system can operate functions such as setting up and managing calling lists for campaigns . . . and setting up the dialing types, rules, and pacing algorithms for predictive dialing and other types of automatic dialing provided by the system." (*Id.* ¶ 53.) Snyder reached the following conclusion on the functionality of the ININ system:

> The [ININ] system produces number to be called, using a sequential number generator and then dials those numbers. . . . Therefore, it is my opinion, based on my knowledge, education, expertise, training, my review of the relevant documents and the facts described above, that the [ININ] system is equipment that stores or produces telephone numbers to be called, using a random or sequential number generator, and dials such numbers. Additionally, the [ININ] system is equipment that dials telephone numbers from a stored list of numbers without human intervention. Furthermore, it is my opinion that the [ININ] system stores telephone numbers and predictively dials them.

(*Id.* ¶¶ 59-60.)

This two-paragraph conclusion does not create a genuine dispute of material fact on whether the ININ system is an ATDS. Despite his conclusions, Snyder's declaration does not explain how the ININ system generates numbers. Instead, he states that:

---

[5] Randall Snyder's declaration addresses two calling systems—the Noble system and the ININ system. (*See* ECF No. 59-8.) Smith's allegations, however, involve only the ININ system. (*See* ECF No. 58 ¶¶ 19-22.) Accordingly, the portion of Snyder's declaration dealing with the Noble system (ECF No. 59-8 ¶¶ 36-47) is irrelevant to the instant Motion.

> The [ININ system] automatically sorts, filters, reorders, and re-sequences telephone numbers based on rules and strategies that have been preprogrammed into the system. Once properly processed, the telephone numbers are stored in a new and specially ordered list in sequence, based on those rules and strategies. This list is subsequently automatically loaded into the [ININ] system to be automatically dialed.

(*Id.* ¶ 58.)  This paragraph of Snyder's declaration indicates that the ININ system does not actually *generate* numbers to be called, either randomly or sequentially. The ININ system may reorder preprogrammed numbers from an independent list into a new sequence, but the system does not generate new numbers to be called. All telephone numbers called through the ININ system are inputted through a prearranged or preprogrammed list. In other words, the ININ system is not an ATDS merely because it reorganizes telephone numbers into a list with a different sequence. And Snyder's declaration does not otherwise establish that the ININ system has the capacity to randomly or sequentially generate telephone numbers to be called.

The Court's conclusion on Snyder's declaration is consistent with how other courts have dealt with it. In *Dominguez*, the Third Circuit held that Snyder's declaration did not create a genuine dispute of material fact on whether the system at issue was an ATDS.[6] *Dominguez*, 894 F.3d at 120-21. There, the Third Circuit stated that "Snyder purports to address present, not just latent, capacity, by repeatedly opining that 'Yahoo's Email SMS Service system had the ability to generate random numbers and, in fact, did generate random numbers.' This opinion, however, is supported by little more than the same type of overbroad, generalized assertions."

---

[6] In *Dominguez*, unlike this case, the district court analyzed the admissibility of Snyder's declaration. *Dominguez*, 894 F.3d at 120-21. The Third Circuit concluded that the district court properly excluded Snyder's declaration. *Id.* Here, however, the Court is not addressing the admissibility of Snyder's declaration or Navient's Motion *in Limine* regarding it. The Court holds that while Snyder's declaration is admissible at the summary judgment stage, it does not create a genuine dispute of material fact on whether the ININ system functions as an ATDS.

*Id.* at 120. "Notably absent, however, is any explanation of how the Email SMS system actually did or could generate random telephone numbers to dial." *Id.* Like in *Dominguez*, the conclusion in Snyder's declaration here is supported only by overbroad generalizations. Crucially, Snyder does not explain how the ININ system actually did or could generate telephone numbers to be called. Accordingly, Snyder's declaration does not create a genuine dispute of material fact that the ININ system is an ATDS. *See also Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F. Supp. 3d 1262, 1265 (S.D. Fla. 2018) ("The Court finds that Snyder's testimony is insufficient to create a genuine dispute of material fact . . . that the EZ-program texting system is not an automatic telephone dialing system under the Telephone Consumer Protection Act.").

Moreover, in another case, Snyder testified that the ININ system does not have the capacity to generate random or sequential numbers. In that case, Snyder testified as follows in a deposition:

Q:      [The ININ system] doesn't have the capability, as you used, to whole cloth generate random numbers for dialing?

A:      That's right. Just doesn't create them and generate them out of thin air.

Q:      And likewise it doesn't have the capability to generate whole cloth a sequential number list independent of what its fed for a particular campaign.

A:      That's right. No automatic dialing systems, actually, that I know if in the United States have had that functionality for 20 to 25 years.

(ECF No. 58 ¶ 29; ECF No. 59-7 at 23-25.)

In conclusion, the Court finds that there is no genuine dispute of material fact that the ININ system that Navient used to call Smith is not an ATDS under the TCPA. Therefore, Smith's TCPA claim fails as a matter of law and Navient is entitled to summary judgment.

## B. The Court Will Decline to Exercise Supplemental Jurisdiction Over Smith's Invasion-of-Privacy Claim

After dismissing of Smith's TCPA claim, Smith's invasion-of-privacy claim under Pennsylvania law remains.

"In any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, "district courts may decline to exercise supplemental jurisdiction over a claim under subsection if . . . the district court has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). "If it appears that the federal claim is subject to dismissal under F.R.Civ.P. 12(b)(6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances." *Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 196 (3d Cir. 1976).

Because Navient is entitled to summary judgment on Smith's TCPA claim, all the claims over which this Court has original jurisdiction will be dismissed. The Court does not find that there are extraordinary circumstances that justify exercising supplemental jurisdiction over Smith's invasion-of-privacy claim under Pennsylvania law. Therefore, the Court declines to exercise supplemental jurisdiction and will dismiss Smith's invasion-of-privacy claim.

## V.    Conclusion

For the foregoing reasons, Navient's Motion for Summary Judgment (ECF No. 56) is **GRANTED**. The Court finds that Navient is entitled to summary judgment on Smith's TCPA claim, and the Court will not exercise supplemental jurisdiction over Smith's invasion-of-privacy claim.  Further, Navient's Motion *in Limine* (ECF No. 60) is **DENIED** as moot.

A corresponding order follows.

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| GREGORY J. SMITH, | ) | |
| | ) | |
| | ) | **CIVIL ACTION NO. 3:17-191** |
| Plaintiff, | ) | |
| | ) | **JUDGE KIM R. GIBSON** |
| v. | ) | |
| | ) | |
| NAVIENT SOLUTIONS, LLC, | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

**AND NOW**, this ___4th___ day of August, 2019, upon consideration of Defendant Navient Solutions, LLC's Motion for Summary Judgment (ECF No. 56), **IT IS HEREBY ORDERED** that the Motion is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant's Motion *in Limine* (ECF No. 60) is **DENIED** as moot.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**